(No. 6691.   July 7, 1939.)

G. H. HANSEN, IDA S. DOLE, H. A. OGSTON, Mrs.
JERRY HAYES and J. D. LOCKERBY, Appellants, v.
INDEPENDENT SCHOOL DISTRICT No. 1 IN NEZ
PERCE COUNTY, IDAHO, Respondent.

[98 Pac. (2d) 959.]

Murray Estes, for Appellants.

Durham & Hyatt, for Respondent.

GIVENS, J.—1934 respondent school district owned one-half of what is now Bengal Field and that year the balance of the ground was purchased by the Associated Student Body of Lewiston High School. From 1934 to 1936 through P. W. A. aid the field was sodded and bleachers erected making it suitable for football. 1937 various citizens and civic groups of Lewiston raised funds to equip the field for baseball.

Under agreement with respondent lighting facilities were installed, the bleachers enlarged and improved and the field made ready for night baseball. April 12, 1937, respondent leased the field to A. B. Kurbitz, owner of a professional baseball club, and night baseball was initiated under that agreement.

April 22, 1938, respondent, through its board of trustees, adopted the following resolution for the purpose of leasing Bengal Field during the 1938 baseball season:

"Be It Hereby Resolved, That the following working arrangements be put into effect by the Board of Directors for the use of Bengal Field during the present baseball season, or so long as such arrangements continue to work out with entire satisfaction to the Board:

"1. The locally sponsored baseball team known as 'The Lewiston Indians' shall be permitted to use the field and keep 90 per cent of the gross receipts from the games they play. The Lewiston Indians will be responsible for

"a. The cost of lighting for games they play, and

"b. The cost of ticket men and policemen for games.

"2. The financial officer of the Lewiston Indians shall turn over 10 per cent of the gross receipts to F. S. Brown, Clerk, once each week, and F. S. Brown will disburse these funds for

"a. The replacement of light bulbs,

"b. One-half the cost of a special caretaker.

"This man is to be employed by the school board, and the other half of his wages will be paid from district funds.

"c. Replacement of sod and permanent equipment for fall sports.

"d. Incidental costs of preparing field for community baseball.

"e. A pro-rated share of the cost of liability insurance. The school board will carry the insurance coverage.

"f. Refunds for the local contributors to the permanent investment. Anything left in this fund at the close of the season will be distributed to these men.

"3. The school board will stand all regular costs to the district, including water, paint, general supervision, and miscellaneous items of upkeep. This will also include one-half

of the wages of a caretaker and a pro-rated share of liability insurance.

''4. Mr. Caple shall represent the school board in directing changes required in preparation for community base-ball and Mr. Markham shall supervise all work of maintenance and operation of the field.

''5. Nothing in this resolution shall be interpreted as to place any additional financial obligation or liability on the school board due to the use of Bengal Field by non-school organizations; nor as to permit any interference with school activities.''

This agreement was later amended by the minutes of respondent's board of trustees of May 9, 1938, as follows:

''Five per cent of the gross gate receipts are to be paid by the Lewiston Indians Baseball Club to F. S. Brown, Clerk, to be expended by him for the following named purposes:

''1. To be applied on the present indebtedness for Bengal Field Improvements, bills that were not fully paid from the collections and receipts during the year 1937, being due Madison Lumber Co., $253.00, Morey-Robison Electric Co., $171.00, and Potlatch Forests, Inc., $187.00, a total of $611.00.

''2. After the above named indebtedness has been paid in full, moneys from the five per cent of gross gate receipts shall be distributed pro rate to the business firms and persons who put up the money for the improvements made in 1937.

''The salary of the ground keeper shall be paid one-half by the school district and one-half by the Lewiston Indians. Other expenses and maintenance, such as replacement of lights, are to be paid by the Lewiston Indians. In case these miscellaneous expenses do not total five per cent of the gate receipts for the season, the balance of the second five per cent is to be paid to F. S. Brown, Clerk, and applied by him in payment of the above mentioned indebtedness.''

Appellants sued to enjoin the use of Bengal Field for the playing of baseball on two grounds: First, that respondent district had no authority to make the lease for the reason that to do so was a pledge of the credit or faith of said school district to the ball club, a private concern, in violation of article 8, section 4 and article 12, section 4, of the Idaho Constitu-

tion, and second, that the use of the field in the manner alleged, constitutes a nuisance.

Article 8, section 4 and article 12, section 4, of the Idaho Constitution prohibit the lending of credit by the state and its political bodies in aid of private objectives. To constitute a violation of said provisions it is essential that there be an imposition of *liability,* directly or indirectly, on the political body. Unless the credit or faith of respondent is obligated there is no constitutional inhibition. (*Atkinson v. Board of Commissioners,* 18 Ida. 282, 108 Pac. 1046, 28 L. R. A., N. S., 412, *School Dist. No. 8 v. Twin Falls etc. Ins. Co.,* 30 Ida. 400, 164 Pac. 1174, and *Fluharty v. Board of County Commrs.,* 29 Ida. 203, 158 Pac. 320.)

In the case at bar the entire cost of equipping the field for baseball, amounting to approximately $8,000, was raised by private contribution. Respondent pledged none of its funds, nor has it contributed any, to the baseball venture. The contract of lease is carefully drawn to eliminate any possibility of district liability. The result so far as respondent's finances are concerned is that it now has a baseball park fully equipped, without expense to it, with complete right to use it for all school purposes. (*Blankenship v. School Dist. No. 28,* 136 Kan. 313, 15 Pac. (2d) 438.)

It is the almost universal rule that the leasing of school buildings and parks for private purposes which are not inconsistent with the conduct of the school, is not an unconstitutional use of such property. (*Merryman v. School Dist. No. 16,* 43 Wyo. 376, 5 Pac. (2d) 267, 86 A. L. R. 1181; *Royse Independent School Dist. v. Reinhardt,* (Tex. Civ. App.) 159 S. W. 1010; *Cost v. Schinault,* 113 Ark. 19, 166 S. W. 740, Ann. Cas. 1916C, 483; *Sheehan v. Board of Education,* 175 Mich. 438, 141 N. W. 574, 45 L. R. A., N. S., 972; annotations in 86 A. L. R. 1195; 86 A. L. R. 1175; 63 A. L. R. 100.)

Though in most of the above cases the constitutionality of the lease was not attacked on the ground of its being a loan of the faith or credit of the state or political subdivision involved, in many of the cases the state constitutions did have provisions similar to Idaho Const., art. 12, sec. 4, and art. 8, sec. 4. In *Ralph v. Orleans Parish School Board,* 158 La. 659, 104 So. 490, suit was instituted to enjoin the school board

from contracting with a private person to set up a lunch counter in the school building during the noon hour on the ground that it was unconstitutional under Constitution of Louisiana, article 4, section 12, which prohibits loaning of state "funds, credits or things of value" to a private person, etc. The court held such use of the school building merely incidental to school purposes and not an unlawful use of school property.

It is next contended that the maintenance of Bengal Field in the manner in which it is conducted constitutes a nuisance in that it is located in a residential district and greatly interferes with the use and enjoyment of appellants' property; that the games are played at night and large crowds of noisy people attend and that the games extend from 8:30 o'clock in the evening until on some occasions as late as 1 o'clock the next morning; that appellants are unable to rest at night because of the noise, dust and beacon lights which light up the surrounding area; that automobiles are parked in such a manner as to seriously interfere with free ingress to and egress from appellants' property and that balls used in play by the ball teams are batted into the yards of appellants and persons trespass upon appellants' property to recover said balls, thereby "causing destruction to plaintiffs' (appellants') property and turmoil and confusion, and that the whole of the said conduct of the crowds attracted by said ball games deprives these plaintiffs of the quiet and peaceable enjoyment of their property as aforesaid."

Stipulated Exhibit 3, a map showing the location of Bengal Field and the residences of appellants and others, many of whom testified in the trial of the case, discloses that with the exception of one witness, all those who live on property most nearly adjoining the ball field testified in favor of appellants.

Respondent places considerable stress on the argument that appellants had acquiesced in the use of the field for football games and that baseball was no more of a nuisance than football. The testimony is uncontradicted, however, that football games were played almost exclusively in the afternoons; that the crowds were not nearly so large; that there was no trespass of balls from the football games and lights, of course,

were not used. Defendant's Exhibit A shows that from April 20th until September 5th, a period of approximately 158 days, there were played 59 games, all but two of which were night games; thus there was a baseball game on approximately one-third of the nights during the summer months.

The evidence herein is ample to sustain the contention of appellants that the use of the field in the manner in which it has been used herein constitutes a legal nuisance *per accidens* consisting principally of four elements, namely, the flooding of appellants' homes with excessive light, preventing or hindering sleep and rest; creation of excessive noise; trespass of balls and people, and parking of automobiles in such a manner as to greatly hinder ingress to and egress from appellants' property.

While respondent is correct in its contention that this court must weigh the relative rights of the parties and that an injunction will not be granted where the loss to defendant far outweighs the benefit to be gained by plaintiff (*Roy v. Chevrolet Motor Car Co.*, 262 Mich. 663, 247 N. W. 774), the court must also take into consideration the fact that the ball field is located in a residential district, that it is especially injurious to appellants in that it is used at night with its attending bright lights, noisy people, heavy automobile traffic and trespassing of balls and people on appellants' property. Baseball games are not nuisances *per se* (*Royse Independent School Dist. v. Reinhardt, supra*), but become such under circumstances such as here where they are conducted in such a manner as to greatly interfere with legitimate and necessary use and enjoyment of the property of others. (*Warren Co. v. Dickson*, 185 Ga. 481, 195 S. E. 568; *Hennessy v. City of Boston*, 265 Mass. 559, 164 N. E. 470, 471, 62 A. L. R. 780; *Cronin v. Bloemecke*, 58 N. J. Eq. 313, 43 Atl. 605; *Gilbough v. West Side Amusement Co.*, 64 N. J. Eq. 27, 53 Atl. 289; *Edmunds v. Duff*, 280 Pa. 355, 124 Atl. 489; 33 A. L. R. 719; *Phelps v. Winch*, 309 Ill. 158, 140 N. E. 847, 28 A. L. R. 1169; annotation, 62 A. L. R. 782.)

The judgment is reversed with directions to issue an injunction restraining respondent from causing the lights to shine into and on appellants premises so as to interfere with their sleep and the reasonable and necessary enjoyment of

their property; from allowing balls to be knocked or thrown onto appellants' premises and from allowing people in search of baseballs to trespass thereon; to restrain the parking of automobiles in such a way as to interfere with free ingress to and egress from appellants' properties, and to desist from noise preventing sleep after a reasonable time in the evening, i. e., after 10 P. M.

Costs awarded to appellants.

Ailshie, C. J., and Budge and Holden, JJ., concur.

Morgan, J., because of illness, did not participate in the decision of this case.

### ON REHEARING.

(January 19, 1940.)

AILSHIE, C. J.—A petition for rehearing was filed in this case and after due consideration a rehearing was ordered and the case was again argued by respective counsel. In the outset, let us make it plain that we have not held, and did not and do not intend to hold, that *night baseball* is a nuisance *per se.* (46 C. J., p. 648, sec. 5.) We have held, and so intended, that under the facts of this case, the game as permitted by respondent and played by the professional baseball club was *in fact* a nuisance to appellants in the use and enjoyment of their property.

We thoroughly appreciate the fact that night baseball has become a popular and wholesome sport, and that it affords entertainment and amusement to many people who could not witness or enjoy the sport in daytime, due to their business, professional, and other engagements. We are also cognizant of the fact that, in the pursuit of this entertainment and pleasure, its devotees have no right to trespass upon the premises or disturb the ordinary use and enjoyment of the homes of law-abiding, industrious citizens. There are certain reciprocal, indubitable rights and privileges to which each is entitled that must be respected by the other; and when appealed to, it is the duty of the courts to protect and assure.

118

The game of night baseball should be played at such place and time, and under such restrictions and regulations, as to afford adequate accommodations and opportunities to the patrons of the game; and at the same time so as not to injure or destroy the property of others or render its uncomfortable or unusable or unreasonably impair it for its intended purposes.

In view of the fact that there is such a great diversity of altitudes and climatic conditions between the cities, towns, and various communities, as well as two standards of time, in this state, which render it impractical to fix an hour for closing night games that will apply with equal justice to all places in the state, we have for those reasons concluded to remand the case to the trial judge, with directions to hear any additional evidence that may be offered on the single question as to the reasonableness of the time at which the game should close on this particular field, in order to properly protect appellants in their rest and the enjoyment of their homes and, so far as possible, give the baseball devotees an opportunity to see the games.

The judgment of the trial court is reversed and the cause is remanded with direction to hear any *additional evidence that may be offered on the single issue as to reasonable hour at which the games should close in order to properly protect the rights of appellants* as above indicated. After finding the reasonable time at which the games shall close, the court will order an injunction, as heretofore directed in the original opinion herein, changing the time of closing to such time as the court finds reasonable.

Givens, Morgan and Holden, JJ., concur.

BUDGE, J., Dissenting.—In the opinion heretofore filed and now here for reconsideration upon petition for rehearing it is contended, and rightly so, that this court in effect held that the playing of night baseball was a nuisance *per se*. This conclusion appears well founded inasmuch as it appears that the result reached in the opinion does not take into consideration the fact that there was a sharp conflict in the testimony offered upon the trial.

That the game of baseball is not a nuisance *per se* is well settled. It is an innocent or legitimate amusement, and, like a legitimate business, to warrant an injunction stopping or destroying it it must appear that indulgence in it is necessarily a nuisance because conducted in such manner as to materially interfere with or prevent legitimate and necessary use and enjoyment of the property of others. (*Royse Independent School Dist. v. Reinhardt,* (Tex. Civ. App.) 159 S. W. 1010; *Alexander v. Tebeau,* (Ky.) 71 S. W. 427; *Riffey v. Rush,* 51 N. D. 188, 199 N. W. 523.) Night baseball is comparatively new, but it might now be said to have become a national game. It is attended by thousands of spectators from all classes throughout the nation. It is a clean and wholesome sport and is in no sense unlawful or objectionable when properly conducted. It is not the playing of night baseball or any legitimate game or sport at night or otherwise which may be said to constitute a nuisance, but it is dependent, rather, upon the sensibilities and enjoyment of peace and comfort of ordinary persons residing in close proximity to the park or playground where such games are held, or of others who may be affected. (*Phelps v. Winch,* 309 Ill. 158, 40 N. E. 847, 28 A. L. R. 1169; *Warren Co. v. Dickson,* 185 Ga. 481, 195 S. E. 568; 46 C. J., p. 677; 20 R. C. L., p. 445.) If the game or games be so conducted as to materially interfere with or prevent the quiet and peaceable enjoyment of property or the normal rest and sleep of ordinary and reasonable persons residing near or adjacent to the place where such games are played, a court of equity would be empowered to enforce such regulations and restrictions as might be necessary, and if need be grant injunctive relief, when a less measure of restriction would not afford relief. (*McPheeters v. McMahon,* 131 Cal. App. 418, 21 Pac. (2d) 606; *Vowinckel v. Clark & Sons,* 216 Cal. 156, 13 Pac. (2d) 733; *McNenomy v. Baud,* 87 Cal. 134, 26 Pac. 795; *Williams v. Blue Bird Laundry Co.,* 85 Cal. App. 388, 259 Pac. 484.) The power to grant injunctive relief should be exercised only when the right is clear and the injury impending or threatening so as to be averted only by the protecting preventative process of injunction, and should rarely, if ever, be issued in a doubtful case. (*McPheeters v. McMahon, supra.*) Whether or not

night baseball as conducted in the instant case was a nuisance was a question of fact to be determined by the trial court in the first instance. (46 C. J., pp. 653, 654, par. 18.) After hearing the evidence in this case the trial court considered the same and made the following finding of fact:

"That Bengal Field is located within a sparsely settled residential district in Lewiston, Idaho, . . . . That the crowds attending the baseball games held at night during the year 1938 at Bengal Field, wherein the Lewiston Indians participated, averaged less than 1,000; that the baseball games played at night during the year 1938 by the Lewiston Indians started not later than 8:15 at night and extended over a period of time not later than 10:30 at night, except on one or two occasions when the baseball games did not terminate until 10:45 P. M.; that the crowds and people attending said baseball games were orderly and that there was no boisterous, indecent or vulgar conduct on the part of the players or the people attending said games, and that the only noise occasioned by said baseball games was the usual noise incident to baseball games; that no turmoil or confusion existed during the use of Bengal Field by the Lewiston Indians; that the noise of increased automobile traffic of stopping, starting and shifting gears was only that necessary and usual in the rightful use of the public streets; that the honking of horns by people attending athletic contests at Bengal Field was after games of football played by the Lewiston High School;

"That the use of Bengal Field for baseball purposes by the Lewiston Indians during the year 1938 did not interfere with the comfortable enjoyment of the property of the plaintiffs, and in no way interfered or obstructed the use of the property of the plaintiffs."

The court then concluded "That the use of Bengal Field by the Lewiston Indians Baseball Club did not constitute a nuisance," that appellants were not entitled to an injunction or restraining order, and that respondent was entitled to a judgment dismissing the complaint with prejudice, and judgment was so entered.

The evidence upon which the trial court reached the foregoing conclusion and finding discloses the following situation: Six people, three appellants residing immediately adjacent to

Bengal Field, one appellant residing approximately a block removed, another appellant residing approximately one and one-half blocks removed, and one witness living immediately adjacent to the field, presented the evidence on behalf of appellants with reference to the conditions existing in the vicinity of Bengal Field during the periods the field was used for night baseball and the effect of such conditions upon their sensibilities and the enjoyment of their property. These six witnesses testified that the use of the field in the manner in which it was used deprived them of the quiet and peaceable enjoyment of their property and of their normal rest and sleep, stating the conditions to be that their homes were flooded with excessive light, excessive noise was created by automobiles stopping and starting and honking of horns; that people attending the games trespassed upon their property and parked their cars so that ingress and egress was greatly hindered; that the crowds were large and excessively noisy and that the games lasted until late at night, even until 1 o'clock or after. Upon the other hand the testimony of thirty-five ordinary persons from all walks of life, residing as close or closer to Bengal Field than the appellant most removed, and at least five of whom lived as close as any appellant, controverted each and every fact testified to by appellants. Twenty-two of these witnesses actually testified and it was stipulated that thirteen others, named, would give substantially the same testimony as those called with reference to the amount of noise, lights, traffic, orderliness of the crowd and other conditions, and the effect of the same upon them. The evidence adduced from these twenty-two witnesses actually testifying discloses they live in as close proximity generally to Bengal Field as do appellants and that they are so situated as to be in a position to receive like or similar effects as appellants from any conditions which might be created by the playing of night baseball at Bengal Field. It appears that night football using the same lighting (at least nine games in 1938) and night softball are played at Bengal Field, as well as night baseball sought to be enjoined by appellants. Neither the night football nor softball are objected to or sought to be enjoined by this action. The softball games have in

most instances ended much later than any baseball game. It appears that football games draw as large or larger crowds and there was much more confusion, noise, cheering, and honking of horns during and after the football games than existed at the baseball games. The testimony of these witnesses, some of whom judged the conditions with reference to periods when ill and bedfast, another with a small baby in the home immediately adjacent to the field, another forced to retire at 7 or 8 o'clock in the evening, is to the effect that the noise and lights attendant to the games of baseball was not excessive and did not interfere in the least with the comfortable and peaceable enjoyment of their property and did not interfere with or prevent normal sleep or rest; that the automobile traffic likewise was not excessive and did not interfere with the enjoyment of any property rights; that the traffic was quietly and quickly dispersed, within five to ten minutes after the conclusion of a game; that the parking of cars had not interfered with ingress and egress and that the car owners were very considerate and did not block driveways or garage entrances or ingress and egress and that in actuality parking lots provided took care of a great share of the parking of cars and that there was no traffic congestion; that the games and the grounds were well policed and the crowds were very orderly, not unusually noisy, did not trespass upon the property of residents in the vicinity and did not honk the horns on their cars either during or after the baseball games; that baseball games usually ended about 10 o'clock or before and that on one or two occasions games had lasted until 10:20 or 10:30 and that softball games had lasted much later; that neither the parking of cars, noise, reflection of lights, nor traffic was excessive, nor were these, or any other conditions which might be attributed to the baseball games, noticeable in any degree which could be said to interfere with their sleep, rest, or the comfortable and peaceable enjoyment of their property. Certainly such evidence, directly contrary to the testimony of appellants upon every phase, directly contrary as to the conditions which actually existed and the effect of such conditions upon persons of ordinary and reasonable sensibilities, creates, to say the least, the sharpest conflict in the

testimony. The court after hearing the evidence found, concluded and adjudged that the conditions existing and their effect upon residents in the vicinity were not such as constituted a nuisance. The rule which this court has announced and reiterated from time to time for a period of many years is that this court will not disturb the findings or judgment of the trial court made upon conflicting evidence and where there is substantial evidence to support them. (*Bachman v. Reynolds Irr. Dist.*, 56 Ida. 507, 55 Pac. (2d) 1314; *Duthweiler v. Hanson*, 54 Ida. 46, 28 Pac. (2d) 210; *Markham v. Davy*, 42 Ida. 545, 247 Pac. 12; *Black v. Black*, 33 Ida. 226, 191 Pac. 353; *Lisenby v. Intermountain State Bank*, 33 Ida. 101, 190 Pac. 355; *Fleming v. Benson*, 32 Ida. 103, 178 Pac. 482; *Brown v. Hardin*, 31 Ida. 112, 169 Pac. 293; *Hemphill v. Moy*, 31 Ida. 66, 169 Pac. 288; *Casady v. Stuart*, 29 Ida. 714, 161 Pac. 1026; *Hardy v. Ward*, 31 Ida. 1, 168 Pac. 1075; *Consolidated Interstate-Callahan Min. Co. v. Morton*, 32 Ida. 671, 187 Pac. 791; *Miller v. Blunck*, 24 Ida. 234, 133 Pac. 383; *Salisbury v. Spofford*, 22 Ida. 393, 126 Pac. 400; *Tomische v. Hummel*, 18 Ida. 23, 108 Pac. 343; *Hutchinson v. Watson Slough Ditch Co.*, 16 Ida. 484, 101 Pac. 1059, 133 Am. St. 125; *City of Pocatello v. Bass*, 15 Ida. 1, 96 Pac. 120; *Miller v. Donovan*, 13 Ida. 735, 92 Pac. 991, 992, 13 Ann. Cas. 259; *Heckman v. Espey*, 12 Ida. 755, 88 Pac. 80; *Spaulding v. Coeur d'Alene Ry. etc. Co.*, 5 Ida. 528, 51 Pac. 408.) This rule applies in a suit in equity as well as an action at law. (*Lus v. Pecararo*, 41 Ida. 425, 238 Pac. 1021; *Wooten v. Dahlquist*, 42 Ida. 121, 244 Pac. 407; *Bedal v. Johnson*, 37 Ida. 359, 128 Pac. 641; *Viel v. Summers*, 35 Ida. 182, 209 Pac. 454; *Davenport v. Burke*, 30 Ida. 599, 167 Pac. 481; *Wolf v. Eagleson*, 29 Ida. 177, 157 Pac. 1122; *Darry v. Cox*, 28 Ida. 519, 155 Pac. 660; *Jones v. Vanausdeln*, 28 Ida. 743, 156 Pac. 615.) The evidence being directly in conflict as to the magnitude of the noise, brilliancy of the lights, demeanor of the crowds, the manner of parking cars, the question of trespass and the effect of all these conditions upon normal and reasonable residents of the community in the same or a like position, and there being substantial evidence to support the trial court's finding and judgment this court should not disturb the same.

There is another reason equally as tenable as that heretofore discussed, namely that the granting of injunctive relief is within the sound discretion of the court. (*Roy v. Chevrolet Motor Car Co.*, 262 Mich. 663, 247 N. W. 774.)

After a more thorough and diligent investigation of the record and the authorities there is no question in the mind of the writer of this opinion but that the court was in error in reversing the learned trial court's judgment, and that the cause should be remanded to be disposed of as herein indicated, that is the judgment affirmed.